**BEN VENUE LABORATORIES, INC., Plaintiff,**

v.

**NOVARTIS PHARMACEUTICAL CORPORATION, Defendant.**

Civ. Nos. 98–2006(WGB), 98–2143 (JAG).

United States District Court,
D. New Jersey.

June 23, 1998.

LeBoeuf, Lamb, Green & McRae, LLP by Frederick B. Lacey, Stuart Alderoty, Newark, NJ, Pennie & Edmonds, LLP by Jonathan A. Marshall, Brian D. Coggio, F. Dominic Cerrito, New York City, for Ben Venue Laboratories, Inc.

Shanley & Fisher, PC by John J. Francis, Jr., Morristown, NJ, Fitzpatrick, Cella, Harper & Scinto by Nicholas Kallas, Robert L. Baechtold, Brian V. Slater, New York City, for Novartis Pharmaceutical Corp.

## OPINION

BASSLER, District Judge.

Plaintiff Ben Venue Laboratories, Inc., a generic drug manufacturer, moves for a preliminary injunction requiring Defendant Novartis Pharmaceuticals Corp., a brand name drug manufacturer, to remove its patent from the Food and Drug Administration's "Orange Book." Plaintiff subsequently filed a motion for leave to file a supplemental complaint. Defendant has filed a motion to dismiss this action pursuant to Fed.R.Civ.P. 12(b)(1). Jurisdiction in this Court is pursuant to 28 U.S.C. §§ 1331 and 1332. For the reasons set forth below, the Court **denies** Defendant's motion to dismiss, **grants** Plaintiff's motion for leave to file a supplemental complaint, and **denies** Plaintiff's motion for a preliminary injunction.

## I. STATUTORY PROVISIONS

A basic understanding of the statutory framework governing the approval of new and generic drugs is essential to understanding the issues being litigated. This case involves the interplay between the patent law and the statutes and regulations governing the Food and Drug Administration's ("FDA's") drug approval process—a "hybrid area of jurisprudence." Brian D. Coggio & Francis D. Cerrito, "The Application of the Patent Laws to the Drug Approval Process," 52 *Food & Drug L.J.* 345 (1997).

The Federal Food, Drug and Cosmetic Act provides for the approval of a new drug through the filing of a New Drug Application ("NDA"). 21 U.S.C. § 355(a). The NDA contains reports of the drug's safety and effectiveness; a list of the articles used as components in the drug; a statement of the composition of the drug; a description of the methods, facilities and controls used in the manufacture, processing and packaging of the drug; samples of the drug or components, if necessary; and samples of the proposed labeling. 21 U.S.C. § 355(b)(1).

More pertinent to this case, the NDA must also contain a list of patents which claim the drug:

> The applicant shall file with the application the patent number and the expiration date of any patent which claims the drug for which the applicant submitted the application or which claims a method of using such drug and with respect to which a claim of patent infringement could reasonably be asserted.... Upon approval of the application, the Secretary shall publish information submitted under [this section.]

21 U.S.C. § 355(b)(1). Upon approval of the NDA, any claimed patents for the approved drug are published in *Approved Drug Prod-*

*ucts with Therapeutic Equivalence Evaluations,* otherwise known as the "Orange Book." 21 U.S.C. § 355(j)(7)(A)(iii).[1]

The statute also allows for FDA approval of generic versions of the brand name drugs.[2] Generic drugs are versions of brand name drugs that contain the same active ingredients, but not necessarily the same inactive ingredients. *Mova Pharmaceutical Corp. v. Shalala,* 140 F.3d 1060, 1063 (D.C.Cir.1998). A generic drug application is known as an Abbreviated New Drug Application ("ANDA"). Unlike the stringent requirements for an NDA, an applicant under an ANDA need not show independent evidence of the safety and efficacy of its generic drug, but instead need only show that its drug is "bioequivalent" to the previously approved brand name drug. 21 U.S.C. § 355(j)(2)(A). Because of this cost savings to the generic drug manufacturer, generic drugs are generally much cheaper to the consumer than brand name drugs.

The ANDA applicant must also certify as part of the application that for each patent listed in connection with the brand name drug:

(I) that such patent information has not been filed;

(II) that such patent has expired;

(III) the date on which such patent will expire; or

(IV) that such patent is invalid or will not be infringed by the manufacture, use, or sale of the generic drug.

21 U.S.C. § 355(j)(2)(A)(vii). The fourth certification (known as a "Paragraph IV certification") is at issue here. An ANDA applicant making a Paragraph IV certification must provide notice to the owner of the patent and the holder of the approved NDA for the listed drug, stating that it has submitted an ANDA and including a "detailed statement of the factual and legal basis of the applicant's opinion that the patent is not valid or will not be infringed." 21 U.S.C. § 355(j)(2)(B)(ii).

An ANDA applicant's Paragraph IV certification has significant legal effects. A Paragraph IV certification creates a cause of action for patent infringement. The patent law provides that submitting an application for an infringing product is in itself an act of infringement. 35 U.S.C. § 271(e)(2)(A). If, within 45 days of receiving notice, the patent owner sues the ANDA applicant for patent infringement, the ANDA approval is essentially stayed for 30 months:

> If the [ANDA] applicant made a [Paragraph IV certification], the approval shall be made effective immediately unless an action is brought for infringement of a patent which is the subject of the certification before the expiration of forty-five days from the date the notice ... is received. If such action is brought before the expiration of such days, the approval shall be made effective upon the expiration of the thirty-month period beginning on the date of the receipt of notice ....

21 U.S.C. § 355(j)(5)(B)(iii). This 30–month stay is to allow the patent infringement action to be litigated in court.

The statute also provides that during the 45–day period after the ANDA applicant gives notice of its Paragraph IV certification, "no action may be brought under section 2201 of Title 28 for a declaratory judgment with respect to the patent." 21 U.S.C. § .355(j)(5)(B)(iii)(III).[3]

---

1. The original applicant for approval of a new drug is often called the "pioneer" applicant, and the drug is referred to as the "brand name" or "listed" drug.

2. The amendments to the statute regarding the approval of generic drugs were made as part of the Drug Price Competition and Patent Term Restoration Act of 1984 (Pub.L.98–417). The amendments are commonly known as the "Hatch–Waxman Amendments" after the sponsors of the law.

3. For more background on the statutory and regulatory framework, *see Mova Pharmaceutical Corp. v. Shalala,* 140 F.3d 1060, (D.C.Cir.1998); *Granutec, Inc. v. Shalala,* 139 F.3d 889, 1998 WL 153410 (4th Cir. Apr.3, 1998). For a detailed summary of the use of patent declaratory judgments in the food and drug context, *see* Jeffrey I.D. Lewis, "Declaratory Judgments of Patent Infringement: What They Forgot About Drug Applications," 7 *Fed. Cir. B.J.* 35 (Spring 1997).

## II. BACKGROUND

Plaintiff Ben Venue Laboratories, Inc.("Ben Venue") is a manufacturer of generic drugs. Defendant Novartis Pharmaceuticals Corp. ("Novartis") is a manufacturer of brand name drugs and manufactures the drug Aredia, which is at issue in this case. Aredia is used to treat bone loss and similar complications of cancer. The active ingredient in Aredia is a chemical compound known as pamidronate disodium. In the Orange Book, Aredia is listed with U.S. Patent No. 4,711,880 ("the '880 Patent"), which covers a compound known as "crystalline disodium 3–amino–1–hydrox ypropane–1,1–diphosphonate pentahydrate." (Pl.'s Mem., Exh. A.) This patent expires on July 29, 2005. (Novartis' Complaint in Civ. No. 98–2143(JAG), ¶ 13.)

Ben Venue has filed an ANDA to manufacture and sell a generic version of Aredia. As part of its ANDA, Ben Venue made a Paragraph IV certification that the '880 Patent "will not be infringed by the sale of the Ben Venue product." (Slater Decl., Exh. A.) The legal basis for Ben Venue's opinion was that

> the protection afforded by the patent is limited to a crystalline hydrate. The defined crystalline form of the compound is said to have certain advantages vis-à-vis the conventional forms of the compound which it is believed [Novartis] would readily admit have been long off patent.

(Id.) Ben Venue went on to explain that its own product "is a lyophilized material, as opposed to the allegedly new and improved crystalline hydrate." (Id.) Ben Venue gave notice of its Paragraph IV certification on March 26, 1998.

Within 45 days giving notice, Ben Venue filed a declaratory judgment action in this Court. Ben Venue's lawsuit did not explicitly challenge the validity of the patent or state that its product was noninfringing. Instead, Ben Venue asserted that the '880 Patent does not "claim" Aredia and that the patent is therefore improperly listed in the Orange Book.

Ben Venue stated that the '880 Patent "is directed to various crystalline forms of Pamidronate that include water of crystallization, i.e., various hydrates of Pamidronate, particularly the pentahydrate." (Compl., ¶ 12.) Ben Venue also claimed that an expert performed x-ray diffraction tests on Aredia and found that it does not contain crystalline pamidronate. Therefore, according to Ben Venue, the '880 Patent cannot "claim" Aredia.

Ben Venue filed a motion for a preliminary injunction shortly thereafter. Ben Venue's asserts because of the improper listing in the Orange Book, it was required to certify against the '880 Patent. Ben Venue was also required to notify Novartis of its Paragraph IV certification. Novartis then had the opportunity, within 45 days, to file a patent infringement suit against Ben Venue. The filing of a patent infringement suit by the patent holder automatically stays the approval of Ben Venue's ANDA for 30 months.

Novartis in fact did file a patent infringement suit against Ben Venue on May 8, 1998 (within the 45–day statutory window) triggering the 30–month stay. That action was consolidated with this matter on May 19, 1998.

Ben Venue asserts that the 30–month delay will cause it irreparable harm from lost market penetration and sales of its generic product during the litigation over the patent. Ben Venue asks the Court to "preliminarily enjoin Novartis from asserting any rights arising from its improper listing and ultimately order Novartis to delist the '880 Patent." (Pl.'s Mem. at 1.).

## III. DISCUSSION

### A. Motion to Dismiss

Because the Court's decision on whether to grant Ben Venue's motion for leave to file a supplemental complaint may be mooted by the motion to dismiss, the Court will first address Novartis' motion to dismiss Ben Venue's complaint for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1). Novartis argues that Ben Venue filed its declaratory judgment action in violation of the statutory prohibition on certain lawsuits created by the Hatch–Waxman Amendments. The statute bars certain declaratory judgment actions during the 45–day

period after notification of a Paragraph IV Certification:

> If an applicant has made a certification [of noninfringement], the approval of the application shall be made effective immediately unless an action is brought for infringement of a patent which is the subject of the certification before the expiration of forty-five days from the date the notice provided ... is received.
>
> \*    \*    \*    \*    \*    \*
>
> In such an action, each of the parties shall reasonably cooperate in expediting the action. *Until the expiration of forty-five days from the date the notice ... is received, no action may be brought under section 2201 of Title 28 for a declaratory judgment with respect to the patent.* Any action brought under section 2201 shall be brought in the judicial district where the defendant has its principal place of business or a regular and established place of business.

21 U.S.C. § 355(j)(5)(B)(iii) (emphasis added). Ben Venue filed its declaratory judgment action on April 28, 1998, 32 days after Novartis received notice of Ben Venue's Paragraph IV Certification.

Novartis asserts that Ben Venue's action is "with respect to a patent" because it challenges a patent listing in the Orange Book. Novartis argues that under the plain language of the statute, Ben Venue's declaratory judgment was premature and that the Court lacks subject matter jurisdiction. Ben Venue, on the other hand, argues that the phrase "with respect to the patent" in 21 U.S.C. § 355(j)(5)(B)(iii) only refers to declaratory judgments that raise the issue of invalidity or noninfringement of the patent. Ben Venue points to the context of the statute, the legislative history and the opinions of various commentators to support its view. Because its lawsuit only raised the propriety of the listing the '880 Patent under the food and drug laws, Ben Venue argues that it was not premature.

The key issue is the meaning of "with respect to the patent." The subsection of the statute in which this phrase appears refers repeatedly to patent infringement suits by the NDA holder/patentee. The *only* type of lawsuit specifically discussed in this section is a patent infringement and invalidity suit. It thus seems odd that the declaratory judgment prohibition would be directed to *any* type of lawsuit. Indeed, there is no indication anywhere in the statute that Congress even considered Orange Book listings as a potential source of litigation.

Novartis asserted at oral argument that the purpose of this statute was to protect the patentee from nuisance suits during the statutory period when it must evaluate its patent and the potentially infringing claims. If the purpose of this statutory provision was simply to protect the patentee from any distraction during the 45 days, however, Congress would have prohibited *any* suit by the generic company, not simply *declaratory judgment* suits "with respect to the patent." That the provision is limited to declaratory judgment actions implies that the provision was aimed solely at the narrow patent issues of infringement and invalidity, which are easily (and frequently) raised in a declaratory judgment suit. Furthermore, the provision does not bar declaratory judgment suits forever, only for that 45-day period in which the patentee is to decide whether to sue for *infringement.* A fair reading of this subsection is that it gives the patentee alone the right to decide whether to raise the issue of infringement.

The limited legislative history also suggests that Congress enacted this provision specifically with invalidity or infringement suits in mind. Ben Venue quotes the House Report, which states, "No action for declaratory judgment regarding patent infringement can be brought within 45 days allowed for notice of certification of patent invalidity or non-infringement." (Pl's Opp. Brief at 8, quoting H.R.Rep. No. 98–857, pt. 2, at 16, *reprinted in* Allan A. Fox & Alan R. Bennett, *The Legislative History of the Drug Price Competition and Patent Term Restoration Act of 1984,* at 44 (FDLI 1987).)

■ The Court therefore does not read this subsection to bar a declaratory judgment raising an Orange Book listing claim, and

**denies** Novartis' motion to dismiss for lack of subject matter jurisdiction.[4]

### B. Motion for Leave to File Supplemental Complaint

■ Ben Venue requests leave to file a supplemental complaint reflecting events (most notably, Novartis' patent infringement suit) that occurred after the filing of its original complaint. The Court may permit a party to file a supplemental complaint "setting forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented. Permission may be granted even though the original pleading is defective in its statement of a claim for relief or defense." Fed. R.Civ.P. 15(d).

Novartis objects that Ben Venue's motion is an attempt to cure its jurisdictionally defective original complaint. Novartis raises the same argument asserted in its motion to dismiss, namely that the original declaratory judgment action was impermissibly filed within 45 days of giving notice of the Paragraph IV certification. The lack of subject matter jurisdiction, according to Novartis, cannot be cured by filing a supplemental pleading.

■ Ben Venue counters that its original pleading was not jurisdictionally barred, and that in any case, a supplemental pleading may cure a jurisdictional defect. As determined in section A, above, the Court determines that Ben Venue's declaratory judgment complaint is not jurisdictionally barred. Even if there was a jurisdictional defect, however, the Supreme Court has indicated that a supplemental complaint may correct such a defect. *Mathews v. Diaz*, 426 U.S. 67, 75, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976). This is also consistent with the Supreme Court's recent decision in *Caterpillar, Inc. v. Lewis*, 519 U.S. 61, 117 S.Ct. 467, 136 L.Ed.2d 437 (1996), in which the Court held that jurisdictional violations during the

course of the proceedings are not fatal to the ensuing case, if there is federal subject matter jurisdiction at the time of final judgment. *Id.* at 476–77.

Furthermore, the Court rejects Novartis' assertion that any supplemental pleadings must now be raised as compulsory counterclaims in the patent infringement suit. Although ordinarily a counterclaim must be interposed "if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim," the Rule specifically provides an exception where the claim had been raised in a previous action: "[T]he pleader need not state the claim if (1) at the time the action was commenced the · claim was the subject of another pending action. . . ." Fed.R.Civ.P. 13(a).

In this case, Ben Venue's claim was the subject of "another pending action," its declaratory judgment action, which the Court has determined was not barred under the statute. Therefore, Ben Venue need not raise the issue as a compulsory counterclaim. The Court **grants** Ben Venue's motion to file a supplemental complaint.

### C. Motion for Preliminary Injunction

The issuance or denial of a preliminary injunction is a matter committed to the sound discretion of the trial court. *Penn Galvanizing Co. v. Lukens Steel Co.*, 468 F.2d 1021, 1023 (3d Cir.1972). However, an injunction is "an extraordinary remedy which should be granted only in limited circumstances." *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 800 (3d Cir.1989).

■ Federal courts sitting in diversity must apply the federal standards for issuance of a preliminary injunction. *Id.* at 799. In ruling on an application for a preliminary injunction, the district court must be convinced that all four of the following factors favor preliminary relief: (1) the likelihood that the moving party will succeed on the merits; (2) the extent to which the moving

---

4. Novartis is correct that a challenge to the appropriateness of an Orange Book listing may be raised as a counterclaim in a patent infringement suit. *See Abbott Laboratories v. Novopharm Ltd.*, 104 F.3d 1305 (Fed.Cir.1997) (claim that listed patent was expired raised as counterclaim in

patent infringement suit). This, however, is not the only way such a challenge can be brought. The Court sees no reason why a party must wait until it is sued for patent infringement to raise the issue of an improper Orange Book listing.

party will suffer "irreparable harm" without injunctive relief; (3) the extent to which the nonmoving party will suffer irreparable harm if the injunction is issued; and (4) the public interest. *American Telephone & Telegraph Co. v. Winback and Conserve Program, Inc.*, 42 F.3d 1421, 1426 (3d Cir.1994).[5]

### 1. Likelihood of Success on the Merits

■ The party seeking an injunction need not show that its "right to a final decision after trial [is] wholly without doubt," *Oburn v. Shapp*, 521 F.2d 142, 150 (3d Cir. 1975); all that is required is a "reasonable probability of eventual success in the litigation." *Kershner v. Mazurkiewicz*, 670 F.2d 440, 443 (3d Cir.1982). The purpose of preliminary relief is to preserve the status quo during the litigation. "A party seeking a mandatory preliminary injunction that will alter the status quo bears a particularly heavy burden in demonstrating its necessity." *Acierno v. New Castle County*, 40 F.3d 645, 653 (3d Cir.1994). The Court finds that Ben Venue has not met this burden.

Ben Venue asserts that the '880 Patent does not "claim" the drug Aredia and is therefore improperly listed in the Orange Book with Aredia. Ben Venue states that the '880 Patent specifically claims the crystalline pentahydrate form of pamidronate. According to Ben Venue, the primary question is "whether Novartis' product contains a compound claimed in its '880 Patent," specifically, whether Aredia contains a crystalline hydrate of pamidronate. Ben Venue submitted an x-ray diffraction performed on Aredia

showing that Aredia contains no crystalline substance that could be identified as a hydrate of pamidronate. (Reffner Decl., Exhs 2–4.) Therefore, according to Ben Venue, the '880 Patent cannot possibly "claim" Aredia and the Orange Book listing is therefore in violation of the statute.

■ Novartis does not contest Ben Venue's assertion that the final drug product Aredia does not contain the pentahydrate form of pamidronate. (Def.'s Mem. at 5 n. 3.) Although the NDA for Aredia lists the generic name and the chemical name of the drug as the pentahydrate,[6] (Camera Decl., Exh. B.), the "dosage form" of the drug product is listed as a "vial-lyophilized."[7] Novartis admits that the dosage form contains the anhydrous (lacking water) form of pamidronate. (Camera Dep., 41:22–23; Cerrito Decl., Exh. 5.) Novartis argues, however, that under the applicable regulations, it properly submitted the '880 Patent for listing in the Orange Book. According to Novartis, the compound covered by the '880 Patent is the "drug substance" or "active ingredient" of Aredia, and drug substance patents must be listed under the regulations.[8]

The statute governing the patent listing obligations for NDA applicants provides:

> The applicant shall file with the application the patent number and the expiration date of any patent which claims the drug for which the applicant submitted the application or which claims a method of using such drug and with respect to which a

---

5. The parties are in dispute as to whether this is a patent case that would eventually be appealed to the Federal Circuit or a non-patent diversity case that would go to the Third Circuit. The Federal Circuit defers to the law of the regional circuit on procedural and non-patent substantive issues. *View Engineering, Inc. v. Robotic Vision Systems, Inc.*, 115 F.3d 962, 964 (Fed.Cir.1997). Therefore, regardless of the type of case, a decision on a preliminary injunction will be reviewed under Third Circuit law. *See Payless Shoesource, Inc. v. Reebok Int'l Ltd.*, 998 F.2d 985, 987 (Fed.Cir.1993)(reviewing denial of preliminary injunction under regional circuit's law).

6. The "established name" of the drug is listed as "pamidronate disodium," which is defined in the United States Pharmacopeia Dictionary as a pentahydrate. (Camera Decl., Exh. A.)

7. "Lyophilization" is "the removal of water under vacuum from a frozen sample; a relatively gentle process for the removal of water in which the water sublimes from the solid to the gaseous state." J. Stenesh, *Dictionary of Biochemistry and Molecular Biology* (2nd ed., 1989).

8. It is important to note the distinction between a drug *product* and a drug *substance*. "A finished drug product is the form of a drug that is ultimately marketed and administered to patients; a bulk substance, on the other hand, is the active ingredient from which the finished product is derived." *Bristol–Myers Squibb Co. v. Shalala*, 892 F.Supp. 295, 296 (D.D.C.1995); *see also* 21 C.F.R. § 314.3.

claim of patent infringement could reasonably be asserted. . . .

21 U.S.C. § 355(b)(1). The FDA regulations interpreting and enforcing this statute clarify the types of patents that are covered:

> For purposes of this part, *such patents consist of drug substance (ingredient) patents,* drug product (formulation and composition) patents, and method of use patents. . . . For patents that claim a drug substance or drug product, the applicant shall submit information only on those patents that claim a drug product that is the subject of a pending or approved application, or *that claim a drug substance that is a component of such a product.*

21 C.F.R. § 314.53(b) (emphasis added).[9] Finally, the preface to the Orange Book also explains the FDA's requirements for which patents must be submitted:

> The patents that the FDA regards as covered by the statutory provisions for submission of patent information are: *patents that claim the active ingredient or ingredients;* drug product patents, which include formulation/composition patents; and use patents for a particular approved indication or method of using the product.

(Slater Decl., Exh. I.)(emphasis added)

Novartis does not dispute that the pentahydrate form of Aredia does not appear in the lyophilized final product, but asserts that under the regulation cited above, its listing of the '880 Patent, which claims a "drug substance that is a component" of the final drug product, was proper. Ben Venue argues, however, that although the '880 Patent covers the drug substance, that substance is not a "component" of the final product, because it does not appear in the final drug product. Because both parties agree that 1) the '880 Patent covers only the drug substance pamidronate disodium, which is a pentahydrate; and 2) the pentahydrate form of pamidronate disodium does not appear in the final drug product, the Court's inquiry is a narrow question of interpretation: whether the Aredia drug substance covered by the '880 Patent is a "component" of the drug product

within the meaning of the statute and the regulations, when it does not appear in the final product.

Initially, the Court notes that Ben Venue appears to argue that "drug substance" patents are not to be submitted for listing in the Orange Book at all. Ben Venue states, "The FDA has strictly limited the listing of patents, focusing on the statutory requirement that only those patents that claim the drug (*i.e.,* the drug product) 'for which the applicant submitted the application' may be listed." (Pl.'s Reply. Mem. at 9 n. 19.) Ben Venue relies heavily on the decision in *Pfizer v. Food and Drug Administration,* 753 F.Supp. 171 (D.Md.1990) to support its position that Novartis improperly listed a patent for a drug substance that does not appear in the drug product. In *Pfizer,* the FDA refused to list a patent that claimed a drug product, a tablet formulation of the drug nifedipine. Pfizer had an approved NDA, but it only covered nifedipine in capsule, rather than tablet form. *Id.* at 173–74. The FDA based its refusal to list the tablet patent on its interpretation of the statute's requirement in 21 U.S.C. § 355(b)(1) that an NDA applicant submit "any patent which claims the drug for which the applicant submitted the application". *Id.* at 174. Because the submitted patent did not claim a drug for which there was an approved application, the FDA held that listing was improper.

In explaining its decision not to list the patent, the FDA interpreted the use of the word "drug" in this section "to mean 'drug product' and thus interprets the statute to require NDA applicants and holders of approved applications to submit to FDA information on patents that claim the drug product for which the applicant has obtained or is seeking approval in its application." (Cerrito Decl., Exh. 1.) The FDA went on to state that although the NDA must include information on the drug substance, "an approved NDA covers only a specific drug product; the application does not cover a drug substance or active ingredient." (*Id.*)

---

9. The Court notes that neither party has challenged the substantive validity of the regulations at issue in this case.

The court in *Pfizer* upheld the FDA's interpretation of the statute as reasonable and consistent with the statutory language, Congressional intent, prior judicial interpretations and the agency's own regulations. *Pfizer*, 753 F.Supp. at 175. Ben Venue argues that the FDA's interpretation, upheld in *Pfizer*, that the term "drug" in the statute means only a drug product, mandates a finding that the '880 Patent (for a drug substance only) is improperly listed.

The Court disagrees. *Pfizer* is distinguishable from this case in several significant aspects. First, as Ben Venue concedes, *Pfizer* turned in large part on the applicant's attempt to list a patent for a new, unapproved tablet drug product. The FDA's explication of the distinction between the drug substance and the drug product was in response to Pfizer's argument that since it already had an approved drug product using the nifedipine drug substance, the FDA should list another, *unapproved* drug product patent, simply because it contained the same drug substance. The FDA's response simply rejected the contention that a company could list patents for *unapproved* drug products, a situation that is not at issue here. In this case, Novartis is not listing an unapproved drug product.

More importantly, and, in the Court's view, fatal to Ben Venue's reliance on *Pfizer* for the proposition that only drug product patents are properly listed, is that the case was decided *before* the FDA had fully stated its interpretation of the patent listing requirements in 21 U.S.C. § 355(b)(1). In 1994, four years after the *Pfizer* decision, and six years after the FDA interpretation of the statute that Ben Venue now relies upon, the FDA promulgated formal regulations on patent certifications, making clear that certain drug substance patents may be listed. *See* 59 Fed.Reg. 50338 (Oct. 3, 1994).

In the final rule made effective in November 1994, the FDA specifically spoke to the types of patents that were to be submitted by NDA applicants. On its own initiative, the agency changed the proposed rule in 21 C.F.R. § 314.50(i)(1)(i)(A) that had required the NDA applicant to submit information on a patent that claims "the drug or drugs". The final version of the rule now states that the applicant must submit information on a patent that claims "a drug (the drug product *or drug substance that is a component of the drug product* )". 59 Fed.Reg. at 50339 (emphasis added). The FDA stated it made this amendment "to clarify the types of patents for which a certification should be made." *Id.*

Similarly, the FDA also amended its proposed version of 21 C.F.R. § 314.53(b), which had required submission of "drug (ingredient) patents," to cover, in the final version, "drug *substance* (ingredient) patents." *Id.* at 50343 (emphasis added).[10] Again, the FDA stated that these changes were "to clarify the type of patents involved." *Id.*

The statute governing listing of patents merely states that NDA applicants shall file "any patent which claims the drug". 21 U.S.C. § 355(b)(1). The regulations clearly indicate that the FDA interprets the ambiguous term "drug" in 21 U.S.C. § 355(b)(1) to include certain drug substance or active ingredient patents, and requires their listing in the Orange Book. The Court concludes that the FDA's construction of the statute to require listing of certain drug substance patents as well as drug product patents is a permissible reading of the statute, and the parties do not argue otherwise. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Counsel*, 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Therefore Ben Venue's assertions that "the drug substance or active ingredient does not determine proper listing" and that "the drug product—and it alone—controls the proper listing," (Pl.'s Reply Mem. at 11), are inaccurate.

In fact, a similar argument to that made by Ben Venue was recently rejected by another court in this District. In *Zenith Laboratories, Inc. v. Abbott Laboratories*, Civ. No. 96–1661 (Oct. 1, 1997)(unpub.), the court denied Zenith's request for a preliminary injunction preventing Abbott from listing two

---

**10.** The FDA further replaced a phrase in the proposed rule, "For patents that claim a drug or drug product" with the phrase "For patents that claim a *drug substance or* drug product". *Id.* (emphasis added).

patents in the Orange Book. (Slater Decl., Exh. K.) The facts presented in *Zenith* are similar to this case, in that Zenith argued, as Ben Venue does, that two listed patents did not "claim" Abbott's drug Hytrin. The issue was whether the patents, which were for the anhydrous forms of the drug substance/active ingredient, were properly listed in the Orange Book with Hytrin, which was approved as the dihydrate (containing two water molecules) form of the drug.

Judge Bissell noted that the FDA had determined that the dihydrate and anhydrous versions of the drug substance were pharmaceutically equivalent or bioequivalent. (*Id.* at 8.) Therefore, the court found that the patents were likely to be construed as properly claiming the drug, regardless of the differences in water of hydration. (*Id.* at 15.) The court also distinguished *Pfizer*, on the grounds that the decision in that case turned on the fact that the patent submitted for listing claimed an *unapproved* form of the drug substance. (*Id.* at 17.) Judge Bissell noted that in *Zenith*, there was no question of unapproved forms, "only a question of different polymorphic forms." (*Id.*) The court therefore held that Zenith had failed to establish a likelihood of success on the merits.

This case, like the *Zenith* decision, involves a change in the hydration of a drug compound. Neither *Zenith* nor *Pfizer*, however, directly addresses the question presented in this case: whether a patented drug substance must appear in the final drug product in order to be properly listed. For this determination, the Court must attempt to discern the statutory and regulatory intent.

■ Although the FDA's listing of a patent may be entitled to some deference, since the FDA has refused to list patents in the past, *see, e.g., Pfizer*, the Court concludes that the FDA's listing should not create any presumption that the patent was correctly listed. The FDA has stated that it lacks the resources and the expertise to review patents submitted with NDAs, and that it intends listing disputes to be settled privately. *See* 59 Fed.Reg. 50338, 50343, 40348 (Oct. 3, 1994). The FDA specifically declined to enact administrative procedures to resolve listing disputes. If a party disputes the accuracy of a listed patent, it may notify the FDA. The FDA will then request that the NDA holder confirm the correctness of the listed patent information. Unless the NDA holder voluntarily withdraws or amends its listed information, however, the FDA will not change the patent information in the Orange Book. 21 C.F.R. § 314.53(f). If the information remains unchanged, future ANDA applicants must still certify to that patent in their applications. *Id.*

The Court was advised at oral argument that Ben Venue has not notified the FDA of its challenge to the accuracy of the '880 Patent listing. The Court assumes that if it had, Novartis would refuse to remove or amend its listing. The Court will therefore turn to the appropriateness of the listing of the '880 Patent.

■ As discussed above, the FDA interprets 21 U.S.C. § 355(b)(1) to require the submission of drug substance or active ingredient patents "that claim a drug substance that is a component of [an approved drug product]." 21 C.F.R. § 314.53(b). Neither party disputes that the '880 Patent is a drug substance patent. The Court's only inquiry, therefore, is whether the patented drug substance, which is a pentahydrate compound, is a "component" of the Aredia drug product that is the subject of Novartis' NDA.

Ben Venue's sole argument on this point is that the patented drug substance here cannot be a "component" of the final drug product because it is not present in the final drug product in its patented pentahydrate form. This interpretation of the word "component," however, is contrary to the FDA's regulatory interpretation of the word, as well as contrary to common sense.

The dictionary definition of "component" is a "constituent part; ingredient," *Webster's Ninth New Collegiate Dictionary*, (1990), or an "element." *Random House Dictionary of the English Language (Unabridged)*, (2d ed.1987). Neither of these definitions implies that the component must be present in the final product in a perfectly unchanged state. In fact, the FDA's own use of terms such as "component," "drug substance," and

"active ingredient" illustrates just the opposite—the FDA clearly contemplates that a drug substance or active ingredient is a "component" of a drug product even when it is not present in the same form in the drug product.

In the agency's regulations on good manufacturing practices, the FDA specifically defines "component" to mean "any ingredient for use in the manufacture of a drug product, including those that may not appear in such drug product." 21 C.F.R. § 210.3(b)(3). Furthermore, that section defines "active ingredient" as

> any *component* that is intended to furnish pharmacological activity or other direct effect in the diagnosis, cure, mitigation, treatment, or prevention of disease, or to affect the structure or any function of the body of man or other animals. *The term includes those components that may undergo chemical change in the manufacture of the drug product and be present in the drug product in a modified form intended to furnish the specified activity or effect.*

21 C.F.R. § 210.3(b)(7) (emphasis added).

As another example, the FDA regulations governing the content of NDAs, for example, requires the applicant to provide "[a] list of all *components* used in the manufacture of the drug product (*regardless of whether they appear in the drug product*); and a statement of the composition of the drug product . . . ." 21 C.F.R. § 314.50(d)(1)(ii)(a)(emphasis added). The FDA thus draws a clear distinction between a *component* going into the drug product and the final *composition* of the drug product. Similarly, in the FDA's requirements for investigational new drug applications, it requires the manufacturer to list "all *components* . . . used in the manufacture of the investigational drug product, *including both those components intended to appear in the drug product and those which may not appear but which are used in the manufacturing process* . . . ." 21 C.F.R. § 312.23(a)(7)(iv)(b) (emphasis added). These definitions clearly show that a drug substance, active ingredient, or any other "component," as understood by the FDA, is not required to appear in its exact same form in the final drug product.

Ben Venue dismisses Novartis' citation of other regulations as "irrelevant to patent listing." (Pl.'s Reply Mem. at 1.) The Court disagrees. It is illogical, indeed, even potentially dangerous, for the FDA to have contradictory understandings of critical terms such as "drug substance," "active ingredient," and "component" within its own regulations. In the context of statutory interpretation, the Supreme Court has adopted a presumption that terms are given consistent meanings throughout a statute:

> Statutory interpretation . . . is a holistic endeavor. A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme—because the same terminology is used elsewhere in a context that makes its meaning clear, or because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law.

*United Savings Ass'n of Texas v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 371, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988); *see also Gustafson v. Alloyd Co.*, 513 U.S. 561, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995) (normal rule of statutory construction is that identical words used in different parts of the same act are intended to have the same meaning). The Court finds this canon equally applicable to the regulatory scheme created by the FDA.

Furthermore, the FDA *has* spoken on this issue within the patent context, and further supports the Court's holding. In a portion of the regulations enacted to interpret the patent restoration provisions of the Hatch–Waxman Amendments, the agency defined "active ingredient" identically to its definition in the good manufacturing practices context, as:

> any *component* that is intended to furnish pharmacological activity or other direct effect in the diagnosis, cure, mitigation, treatment, or prevention of disease, or to affect the structure or any function of the body of man or of animals. *The term includes those components that may undergo chemical change in the manufacture of the drug product and be present in the drug product in a modified form intended to furnish the specified activity or effect.*

21 C.F.R. § 60.3(b)(2) (emphasis added). There can therefore be no serious question that, under 21 C.F.R. § 314.53(b), a "drug substance" or "active ingredient" may be a "component" of a drug product regardless of whether it appears in the same form in the drug product.

There is no dispute that the patented pentahydrate form of the Aredia drug substance is used in the manufacture of the Aredia drug product. The Court concludes that under the meaning of 21 C.F.R. § 314.53(b), the patented drug substance is a "component" of the drug product and that Novartis was therefore acting within the regulations and the statute when it submitted the '880 Patent for listing. Because the Court concludes that the '880 Patent is very likely properly listed in the Orange Book, Ben Venue has not made a sufficient showing of success on the merits sufficient to warrant a preliminary injunction.

### 2. *Irreparable Harm to Moving Party*

In this Circuit, "to show irreparable harm a plaintiff must 'demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial.' Economic loss does not constitute irreparable harm." *Acierno v. New Castle Cty.,* 40 F.3d 645, 653 (3d Cir.1994) (citing *Instant Air Freight* ). Thus, in order to warrant a preliminary injunction, the injury created by a failure to issue the requested injunction must " 'be of a peculiar nature, so that compensation in money cannot atone for it.' " *A.O. Smith Corp. v. FTC,* 530 F.2d 515, 525 (3d Cir.1976) (citation omitted). Moreover, "[a]n inability to precisely measure financial harm does not make that harm irreparable or immeasurable." *Acierno,* 40 F.3d at 655.

The Court finds that Ben Venue has not made a sufficient showing of irreparable harm. Ben Venue claims that its generic version of Aredia will be a major product and is a significant part of Ben Venue's "five-year plan." Ben Venue also claims that its customers expect that it will be available by 1999, and that Ben Venue will lose market share if its approval is significantly delayed. The harm Ben Venue is asserting is essentially economic harm, which is not sufficient to grant injunctive relief. *Acierno,* 40 F.3d

at 653. Ben Venue has provided projected sales figures for its pamidronate product according to its five-year plan. Plainly Ben Venue's harm is quantifiable, even accounting for potential loss of market share. Based on figures as recent as the first quarter of 1998, Ben Venue has been able to calculate how much it would make out of its pamidronate product. (Cerrito Decl., Exh. 9.) It has even been able to take into account price increases by Novartis and the effect of another generic competitor in the marketplace. (Rusillo Dep., 150–51; Slater Decl., Exh. B.)

Nor has Ben Venue made a showing that its harm is *immediate. ECRI v. McGraw–Hill, Inc.,* 809 F.2d 223, 226 (3d Cir.1987). Ben Venue's allegations of immediate harm are undermined by its admission that development on its generic pamidronate product began as early as 1994. (Russillo Dep., 42:24–25; Slater Decl., Exh. B.) Ben Venue must have been aware of the Orange Book listing and its patent certification obligations at that time. If Ben Venue's arguments as to the nature of this suit are credited, this case could have been brought at any time. Ben Venue has not explained why the suit was brought several years after a potential violation of the statute could have been discovered. Even as recently as this year, Ben Venue delayed five weeks in notifying Novartis of its Paragraph IV Certification. There was, therefore, a delay of over a month in which Ben Venue knew of its claim but did nothing until a patent infringement suit by Novartis was inevitable.

Furthermore, the Court does not find that the 30–month delay in Ben Venue's ANDA approval caused by the Paragraph IV certification is sufficient irreparable harm. The stay applies only to FDA approval, not to the FDA's review process itself. Ben Venue has presented no evidence, other than the unsupported speculation of its Vice President, that the FDA will abandon its ANDA during the patent infringement suit. Ben Venue itself certified to the FDA that it does not plan to market its generic version of Aredia for at least a year, until mid–1999. (Russillo Dep., 17:12–17; Slater Decl., Exh. B.) Moreover, Novartis has the statutory right to sue Ben Venue based on the Paragraph IV certifica-

tion. Given the weak showing of likelihood of success on the merits of its improper listing claim, there is little chance that Ben Venue is being subjected to a patent infringement suit in derogation of the statute. The Court therefore concludes that Ben Venue has not made an adequate showing of irreparable harm.

### 3. *Balance of the Hardships*

■ Because the Court has found that Ben Venue has not made a showing on likelihood of success or irreparable harm, a preliminary injunction cannot issue. The Court will, however, deal briefly with the other requirements of an injunction. The Court finds that granting a preliminary injunction removing a listed patent would harm Novartis' ability to defend its patent against potential infringers and would undermine the statutory protection provided to pioneer drug manufacturers. Furthermore, the Hatch–Waxman statutory scheme was intended to expedite the resolution of patent disputes for the benefit of both the pioneer drug makers and the generic companies. Granting an injunction without a strong showing that the '880 patent is in fact improperly listed would disrupt this statutory scheme and create uncertainty about the status of the listing. This factor therefore weighs in favor of denying an injunction.

### 4. *Public Interest*

■ There have been many judicial and legislative statements concerning the policy underlying the 1984 law. The Court will merely state that Congress plainly enacted the Hatch–Waxman Amendments to further the important goals of increasing access to lower-cost generic drugs while protecting the significant investment of pioneer drug manufacturers. The public is served by implementing the will of Congress and applying the statutory and regulatory scheme as enacted.

Although Ben Venue invokes the public interest in having generic drug alternatives in the marketplace, the Court does not find this interest alone enough to outweigh the clear mandate of the statute and regulations. "Our policy would be very different indeed if the courts could decline to enforce clear laws merely because they thought them contrary to the public interest." *Mova Pharmaceutical Corp. v. Shalala*, 140 F.3d 1060, 1067 n. 6, (D.C.Cir.1998). The Court therefore finds that the public interest favors denial of a preliminary injunction in this case.

### IV. *CONCLUSION*

For the foregoing reasons, the Court **denies** Novartis' motion to dismiss, **grants** Ben Venue's motion for leave to file a supplemental complaint, and **denies** Ben Venue's motion for a preliminary injunction. An appropriate order follows.

### *ORDER*

This matter having come before the Court on the motions of Plaintiff for a preliminary injunction and for leave to file a supplemental complaint; and on the motion of Defendant to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(1);

The Court having considered the submissions of the parties and the argument of counsel;

For the reasons set forth in the Court's Opinion filed this day; and

For good cause shown;

It is this 23rd day of June, 1998, hereby ORDERED that Defendant's motion to dismiss is **denied;**

It is further ORDERED that Plaintiff's motion for leave to file a supplemental complaint is **granted**, and that Plaintiff shall file a supplemental complaint within ten (10) days of the date of this Order; and

It is further ORDERED that Plaintiff's motion for a preliminary injunction is **denied.**